UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

STEPHEN OMOGBEHIN,            . Case No. 06-4581(JEI)
                             .
                             .
         v.                  . 1 John F. Gerry Plaza
                             . 4th & Cooper Streets
                             . Camden, NJ 08101
MARIA CINO, Acting           .
Secretary, Department        .
of Transportation,           .
                             .
         Defendant.          . February 21, 2008
. . . . . . . . . . . . . .   10:31 a.m.


TRANSCRIPT OF STATUS AND DISCOVERY CONFERENCE
BEFORE HONORABLE JOEL SCHNEIDER
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:          DENNIS L. FRIEDMAN, ESQ.
                            1515 Market Street
                            Suite 714
                            Philadelphia, PA  19102


For the Defendant:          Office of the U.S. Attorney
                            By:  KAREN H. SHELTON, ESQ.
                            402 East State Street #430
                            Trenton, NJ  08608

Audio Operator:             Sarah Kilborn


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

2

1            THE COURT:  This is the matter of Omogbehin versus

2   Cino, Docket 06-4581.  The Court notes that it's now 10:30.

3   This was a scheduled in-court appearance for 10:00.  Defense

4   counsel is present on a timely basis.  Plaintiff's counsel is

5   not present.  We have not -- my chambers has not heard from

6   plaintiff.  We tried to call him and had to leave a message on

7   a voice mail.  Can we have an entry for the defendant, please?

8            MS. SHELTON:  Yes, Your Honor.  Assistant United

9   States Attorney Karen Shelton for the defendant.

10           THE COURT:  Ms. Shelton, have you heard from Mr.

11  Friedman about today's proceeding, whether he was going to be

12  present or late?

13           MS. SHELTON:  No, Your Honor.  I actually left him a

14  message early this morning, because I myself didn't realize

15  that there was a conference this morning until about 7:00.  So

16  I called him at about 8 or 8:30 to inform -- to remind him, but

17  I don't know whether or not he ever received that message this

18  morning.

19           THE COURT:  Was there a problem with notice of this

20  conference?

21           MS. SHELTON:  I'm unaware of a problem, Your Honor.

22  I do know that I believe it was your Clerk who called regarding

23  a letter that the parties had submitted about a new discovery

24  dispute, and the Clerk informed me that the Court intended to

25  address it at this regularly scheduled conference and would I

3

1   please inform plaintiff.  I -- when I called -- or when I

2   called Mr. Friedman, I said the Court's not going to give us an

3   additional conference.  They're going to deal with it at the

4   regularly scheduled conference at the end of February.  He said

5   what is that date?  I said I don't know without looking at the

6   order.  I'll have to look for it.

7           THE COURT:  It wasn't --

8           MS. SHELTON:  And that's where I left it.  I didn't

9   remind him particularly of that date.

10          THE COURT:  Ms. Shelton, it was in the October 22nd,

11  2007 order.

12          MS. SHELTON:  Yes, Your Honor, and I have a copy of

13  that order.  I presume plaintiff's counsel does as well.

14          THE COURT:  Well, I'm not sure it's productive how

15  much we can accomplish today without Mr. Friedman.  If you want

16  to make an application for your costs for wasting your time for

17  coming here, that's up to you.  I'll certainly entertain it.  I

18  read through the letter, and I was prepared to address the

19  issues today.  Well, we may have gotten Mr. Friedman on the

20  phone.  Let's see what happens here.  Hello.

21          MR. FRIEDMAN:  Hi, Judge Schneider.

22          THE COURT:  Hi, Mr. Friedman.  We're in court.  We're

23  on the record, and it's about 10:35, and Ms. Shelton is in the

24  court with us.  We were expecting you to be here.

25          MR. FRIEDMAN:  Judge, I have it in my Outlook

4

1 calendar for 11:00.  I apologize.  If -- apparently, I -- oh,

2 gosh.  I apologize for not being there.  It wasn't that it was

3 intentional.  I had it diaried for 11.

4            THE COURT:  Are you on your way here?

5            MR. FRIEDMAN:  I don't know how my secretary could

6 have made the mistake.

7            THE COURT:  Are you on your way here, Mr. Friedman?

8            MR. FRIEDMAN:  Right now I'm at Exit 9B of the

9 freeway.  I had just come from the New Jersey Superior Court in

10 Atlantic County.  I have all the materials ready.  I was

11 prepared to be there well before 11:00, which I thought was the

12 scheduled time.

13            THE COURT:  You won't be here for another hour.  Mr.

14 Friedman.

15                     (No verbal response)

16            MR. FRIEDMAN:   Hello.

17            THE COURT:  Can you hear me, Mr. Friedman?

18            MR. FRIEDMAN:  Hello?  Hello?

19            THE COURT:  Can you hear me, Mr. Friedman?

20            MR. FRIEDMAN:  Hello?

21            THE COURT:  Well, for the record, Mr. Friedman was on

22 the phone.  He said he was at Exit 9B.  He said that he

23 intended to be here at 11:00.  The Court is very familiar with

24 the New Jersey Turnpike, and the Court estimates that it's

25 approximately at least an hour away.  So that the Court does

1  not surmise that Mr. Friedman will get here, if he's on his way

2  here, until at least 11:30.  Ms. Shelton, do you have time to

3  stay?

4         MS. SHELTON:  Your Honor, I'd be more than happy to

5  stick around until Mr. Friedman shows up, so we can handle this

6  providing it fits with the Court's calendar.  I'd prefer to get

7  this out of the way today.

8         THE COURT:  I probably -- yes, so would I.  I would

9  -- I probably can work it in if you would -- if you could just

10 be a little patient with me while I juggle some things.  Let me

11 see this is him on Line 1.  Hello?

12        MR. FRIEDMAN:  Hi, Judge.

13        THE COURT:  Mr. Friedman, are you on your way here?

14        MR. FRIEDMAN:  I am the Woodbury/Runnemede exit of

15 the freeway.  I had just come from a Superior Court in Atlantic

16 County.

17        THE COURT:  Oh, I thought that you were on the New

18 Jersey Turnpike.

19        MR. FRIEDMAN:  No.  No.

20        THE COURT:  You might be here in a half an hour then.

21        MR. FRIEDMAN:  I will be there probably within the

22 next 15 minutes.

23        THE COURT:  All right.  We'll wait for you, Mr.

24 Friedman.

25        MR. FRIEDMAN:  Pardon me?

**J&J COURT TRANSCRIBERS, INC.**

6

1          THE COURT:  We'll be here waiting for you.

2          MR. FRIEDMAN:  Okay.  Thank you very much.  Bye now.

3          THE COURT:  Okay.  Well, that's good.  I thought he

4   was on the New Jersey Turnpike.  So if we could just be a

5   little patient, Ms. Shelton, I think we'll be able to work

6   through this, and it sounds like there was an inadvertent error

7   on Mr. Shelton's part, and these sorts of things happen to

8   everyone.  You were fortunate that you caught it.  Right?

9          MS. SHELTON:  Yes.

10          THE COURT:  So in that event, I would hope that you

11   would choose not to file a motion for costs.

12          MS. SHELTON:  I have no intention of filing any.

13          THE COURT:  But I'm not preventing you from doing

14   that.  But let's wait until he gets here.  We'll juggle a

15   couple of things, work through this, and see if we can get

16   through these discovery issues and get on track in this case.

17   So thank you for your patience, Ms. Shelton.  So we're

18   adjourned for the moment while we wait for Mr. Friedman to get

19   here.  Thank you, Ms. Shelton.

20                          (Recess)

21          THE COURT:  This is the matter of -- bear with me.

22   Please excuse me of I mispronounce the name -- Omogbehin versus

23   Cino, Docket 06-4581.  Please be seated.  Mr. Friedman, I know

24   there was some mixup with the time.  There's no question in the

25   Court's mind that you're acting in good faith.  It was

1  inadvertent, so forth.  These things happen, so I don't want

2  you to lose any sleep over it.  Okay?

3       MR. FRIEDMAN:  I did figure out the cause.  The --

4  this conference had been originally scheduled for December the

5  17th at 11:00 a.m. and --

6       THE COURT:  Okay.  These things happen, and I'm sure

7  it won't happen again, and you have a very gracious adversary,

8  so let's just move on.  What I want to do is I want to address

9  the parties' discovery issues and get a discovery schedule.  I

10  do want to say something.  I'm probably going to have to take a

11  call in between this, but they shouldn't take long, so bear

12  with me, counsel.  Let me just interrupt now.  Go off the

13  record.  Let me take this call, because we' trying to --

14                    (Off the record)

15       THE COURT:  We're back on the record.  I had to take

16  that phone call.  I may have another one at 12.  Again, I don't

17  think it will take long.  I want to address the parties'

18  discovery issues, but before we get to the substance of the

19  objections and the issues in dispute, I want to make the

20  parties aware that what will guide and override our discussion

21  and the Court's rulings is Federal Rule of Civil Procedure

22  26(b)(2), which deals with limitations on the frequency and the

23  extent of discovery.

24       There is no question that the plaintiff is entitled

25  to relevant discovery in the case.  There is no question that

1  plaintiff is entitled to electronic discovery, however, the

2  bounds of discovery are not limitless, and what the rules

3  provide in 26(b)(2)C, the rule states that, "On motion or on

4  its own the Court must limit the frequency or extent of

5  discovery otherwise allowed," and I'm paraphrasing, if the

6  discovery is unreasonably cumulative or duplicative or unduly

7  burdensome, the party has had ample opportunity to obtain the

8  discovery, or, what's particularly relevant to this case, the

9  burden or expense of the proposed discovery outweighs its

10  likely benefit considering the needs of the case, the amount of

11  controversy, the parties resources, the importance of the

12  issues at stake in the action, and the importance of the

13  discovery in resolving the issues.  And I just want to remind

14  the parties that the Court intends to keep that limitation in

15  mind when we go through these discovery issues.

16       My general impression of what's happening here is

17  that this search for electronic discovery is overwhelming the

18  case, and it has become a case within a case.  Yes, the

19  plaintiff is entitled to electronic discovery, but my general

20  impression -- because we've been here a few times before

21  addressing this -- these issues, and I'm aware of the extent

22  and the detail and the burden and the expense of what's been

23  going on here, my general sense, without getting into specifics

24  is that it's overkill given what we're looking for.  So without

25  making any specific rulings, those are my general impressions.

9

1  So what I want to do is I want to go through the issues in the
2  January 31st letter, see if there's any other issues, and then
3  get a scheduling order that we're going to abide by.
4          MR. FRIEDMAN:  May I be heard on some fundamental
5  issue before we get into the specific --
6          THE COURT:  What is that, Mr. Friedman?
7          MR. FRIEDMAN:  The fundamental issue is an issue of
8  obtaining the actual physical evidence that Mr. Omogbehin had
9  asked for.
10         THE COURT:  Okay.  Isn't that covered in this letter?
11         MR. FRIEDMAN:  That is covered at the outset.
12         THE COURT:  So we'll get to it then.  Is there
13  anything you want to say as a general matter that's not in this
14  letter?
15         MR. FRIEDMAN:  Yes.  What I wanted to say is that we
16  had two prior conferences, the first one was on June the 7th,
17  2007, which was more than a half a year ago, and at that
18  conference agency or government's counsel at the time, Mr.
19  Aftab, represented to the Court that he would turn over the
20  backup tape.  Had we had the backup tape, we would not be
21  involved in the extent of litigation that we're involved in
22  now.  He represented to the Court on Page 8 of the transcript,
23  and I will read --
24         "THE COURT:  So what does that have to do with the
25  retrieval of this tape?  You have the tape in its -- a original

1  format."

2        MR. FRIEDMAN:  And then Mr. Aftab responded --

3        "MR. AFTAB:  Yes, that's correct, Your Honor.  We did

4  as the plaintiff had requested, period."

5        "THE COURT:  And you did copy that for plaintiff?"

6        THE COURT:  What -- get to the point, Mr. Friedman.

7        MR. FRIEDMAN:  Okay.

8        THE COURT:  We have a lot to cover.  What's the

9  point?

10       MR. FRIEDMAN:  Mr. Aftab represented that he had the

11 tape, and that he would produce the tape for us.

12       THE COURT:  Okay.

13       MR. FRIEDMAN:  They did not produce the tape.  They

14 had produced CDs.  These CDs, we contend, do not contain all of

15 the information that is in the backup tape.  This case involves

16 a very important matter, which is Mr. Omogbehin's termination.

17 It involves a lot of money to him, and it has turned into a lot

18 of expense for him, not the government but Mr. Omogbehin,

19 because he wanted the physical evidence to show that the

20 reasons why he was terminated were purely, utterly, totally

21 pretextual.  The agency gave reasons why he was terminated

22 after seven and a half months.  He was the IT Manager.  He came

23 into an organization --

24       THE COURT:  Mr. Friedman, I don't want to argue the

25 merits of the case.  I thought you had something to add that

1    wasn't in your papers.  We're going to go to the letter.  Okay?

2    So let's put aside the opening statement and closing statement.

3    Let's get to the issues in the letter starting on Page 1.

4    Okay?  What's the first issue, Ms. Shelton, that's set forth in

5    the letter.

6              MS. SHELTON:  With respect to the general concerns,

7    Your Honor, or do you want to go to the specific concerns --

8              THE COURT:  Well --

9              MS. SHELTON:  -- which begin on Page 2?

10             THE COURT:  Let's go to the specific issues.  We've

11   done enough of the general concerns.  What is the first issue?

12             MS. SHELTON:  With respect to the e-mails of

13   Christian and Smith, who I believe, Your Honor, are H.R.

14   personnel, the plaintiff had requested all e-mails for these

15   individuals, and because these people are H.R. personnel, not

16   every e-mail that goes to them or that they receive can be

17   produced to plaintiff for privacy concerns of the other

18   employees who are not parties to the case.

19             THE COURT:  Have you produced all of the e-mails of

20   these two employees relating to the plaintiff?

21             MS. SHELTON:  Yes, Your Honor, we have.

22             THE COURT:  So is the plaintiff requesting e-mails

23   concerning other employees besides himself?

24             MS. SHELTON:  Your Honor, I don't know what the

25   plaintiff is requesting beyond what we've produced.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  All right.  Mr. Friedman, why -- if the

2   defendant has represented that they've produced the e-mails

3   from Christian and Smith regarding the plaintiff, why isn't

4   that sufficient?

5           MR. FRIEDMAN:  Because we strongly believe, based on

6   evidence that we already have, that there was spoliation of

7   evidence.  The information that the agency claims it had

8   supplied to us came exclusively from the electronically stored

9   information.

10           THE COURT:  My question is what is -- you have asked

11   for the e-mails of Christian and Smith regarding employees

12   other than the plaintiff.  Is that correct?

13           MR. FRIEDMAN:  Yes.

14           THE COURT:  My question is what is the relevance of

15   that information?

16           MR. FRIEDMAN:  The relevance of this information is

17   to show, number one, that the agency engaged in spoliation of

18   evidence, because there's an absence of information relating to

19   Stephen Omo --

20           THE COURT:  So you want to find out about every e-

21   mail that these two employees sent or received in order to

22   prove that there was spoliation?

23           MR. FRIEDMAN:  No, that is not what we want to do.

24   We want to show that as Human Resources Specialists, that they

25   regularly work with the management officials who were involved

**J&J COURT TRANSCRIBERS, INC.**

13

 1  in the actual disciplining of employees.  These --

 2           THE COURT:  So can't you cover that at their

 3  depositions?

 4           MR. FRIEDMAN:  Cover what?

 5           THE COURT:  This question, how they deal with

 6  management --

 7           MR. FRIEDMAN:  Cover what question?

 8           THE COURT:  How they deal with management personnel.

 9           MR. FRIEDMAN:  Yes.  No, I think -- we haven't gotten

10  into the fact issues, because we're trying to get the documents

11  first that have been withheld.  And the purpose of getting the

12  documents is to show that Human Resources people regularly deal

13  with management personnel, and they communicate via e-mail, and

14  the e-mails show an interaction where they give advice, and

15  they have inquiries from management personnel as to how to deal

16  with problematic employees.  There is a total absence of any e-

17  mail information relating Stephen Omogbehin, and we contend

18  that the backup tapes would show that these individuals

19  regularly communicated --

20           THE COURT:  We're not talking about backup tapes

21  right now.  We're not -- we're talking about e-mails of

22  Christian and Smith.

23           MR. FRIEDMAN:  And that goes to the fundamental issue

24  of all of the information that they are supplying is coming

25  from the backup tapes.

14

1          THE COURT:  We'll get to that.  We'll get to that.

2  Okay.  The Court is prepared to rule on the first issue on Page

3  2 of the January 31st, 2008 letter, Subsection A.  Plaintiff

4  has requested all e-mails of Christian and Smith.  The Court

5  denies that request as requesting irrelevant information.

6  Clearly, these employees, Christian and Smith, have to produce

7  their e-mails regarding the plaintiff.  Ms. Shelton has

8  represented that whatever e-mails are available from these two

9  individuals, Christian and Smith, regarding the plaintiff have

10  been produced.  They do not have to produce e-mails regarding

11  employees other than the plaintiff, because they're irrelevant

12  to the issues in the case.

13          MR. FRIEDMAN:  May I --

14          THE COURT:  No, you not, Mr. Friedman.  If plaintiff

15  wants to inquire of the dealings of Christian and Smith with

16  management personnel and what their general practice and

17  procedures were regarding communications with management

18  personnel, he can explore that at the depositions of Christian

19  and Smith.  Next issue.  We're not going back.  We're going

20  forward.  Next issue.

21          MR. FRIEDMAN:  Your Honor, before we get to the next

22  issue, you're making a ruling.  It is my understanding that

23  this is a pre-motion conference and we are -- we have not even

24  filed our motion papers.

25          THE COURT:  Mr. Friedman, local rules provide that a

**J&J COURT TRANSCRIBERS, INC.**

motion for discovery cannot be filed without leave of court.
The purpose of this letter is to identify and address the
discovery issues in the case without the necessity of the
motion.  You can order a copy of this transcript and do with it
as you like.  I am making rulings on the discovery issues and
disputes between the parties.  I've made my ruling on the first
issue identified in Subsection A, Page 2 of the January 31st
letter.  Ms. Shelton, what's the second issue?

MS. SHELTON:  Your Honor, the second issue was
respecting Cleave Laswell, who was responsible for the Lotus
Notes administrator who retrieved the backup -- who retrieved
information from the backup tape and put it on CD.  Plaintiff
wanted to know who he worked for and determine the scope of any
contract that this employee had with the government, and that
individual was recently deposed.  And my understanding that
that issue is resolved as a result, but --

THE COURT:  So as far as you're concerned, is this
issue moot?

MS. SHELTON:  It is to me, Your Honor.  I don't know
how plaintiff feels?

THE COURT:  Mr. Friedman, the issue identified in
Subsection B, Page 3, is that issue moot?

MR. FRIEDMAN:  No, we don't have the information
relating to the scope of any contract pertaining --

THE COURT:  Did you depose Mr. Laswell?

1          MR. FRIEDMAN:  Yes.

2          THE COURT:  Did you inquire of him what his job

3   duties were with regard to the retrieval at issue in this case?

4          MR. FRIEDMAN:  Yes.

5          THE COURT:  Okay, so why do you need the contract?

6          MR. FRIEDMAN:  Because the -- he did not give me a --

7   he did not give me any type of specific response to that.

8          THE COURT:  Didn't you ask him what he did to

9   retrieve the information you requested?

10         MR. FRIEDMAN:  Yes.

11         THE COURT:  Okay.  The Court rules with regard to the

12   issue identified in Subsection B.  That the issue is moot at

13   this point.  Plaintiff's request for additional information

14   regarding Mr. Laswell is denied.  The plaintiff deposed Mr.

15   Laswell, had every opportunity to ask him about what he did

16   with regard to a search for information relevant to this case.

17   Mr. Friedman has represented he made that inquiry, so

18   additional documentation is not needed in this case since the

19   deposition testimony of Mr. Laswell has already been provided.

20         MR. FRIEDMAN:  Your Honor --

21         THE COURT:  Next issue.

22         MR. FRIEDMAN:  May --

23         THE COURT:  Next issue, Mr. Friedman.  We're going

24   forward not backwards.  Ms. Shelton, what's the next issue?

25         MS. SHELTON:  Your Honor, there was -- plaintiff had

17

1   made a request to produce documents that Shelley Yak had stored

2   on her desktop, that is the hard drive of the computer that

3   sits on her desk as opposed to a network drive, and the

4   defendant had indicated that there were none stored on her

5   desktop.  The plaintiff then asked, well, you didn't say

6   whether or not anything was stored on her laptop, to which we

7   responded that there was no laptop.  There was only the hard

8   drive desktop.

9           THE COURT:  Mr. Friedman, what is it you're

10  requesting from Ms. Yak?

11          MR. FRIEDMAN:  There was no response from the agency

12  to my -- from the defendant, to my knowledge, that Ms. Yak did

13  not have a laptop computer.

14          THE COURT:  They just represented that.

15          MS. SHELTON:  And I believe there was a letter to

16  that effect.

17          THE COURT:  Defendant has represented on Page 3 of

18  its letter, "Shelley Yak has no laptop computer, comma,

19  ellipsis with four dots, close quote."  Does that -- does that

20  end your inquiry?

21          MR. FRIEDMAN:  Page 3 of the letter?

22                      (Pause)

23          MR. FRIEDMAN:  No, it does not, because we don't know

24  whether at the relevant time period she had a laptop.

25          THE COURT:  Ms. Shelton, are you representing that at

1  the relevant time period in this case, while the plaintiff was

2  employed, that Ms. Yak had -- did not have a laptop computer?

3          MS. SHELTON:  Yes, Your Honor.

4          THE COURT:  Isn't that what you want, Mr. Friedman?

5          MR. FRIEDMAN:  Yes.

6          THE COURT:  Okay.  So that issue is moot.  Let's go

7  to the next issue, Subsection D on Page 3.  What is the issue

8  here?

9          MS. SHELTON:  Your Honor, I need to have a copy of

10 the interrogatories in front of me.  This is from the second

11 set.  Right?  There was more than one.

12         MR. FRIEDMAN:  I don't believe there --

13         MS. SHELTON:  I believe what -- what plaintiff was

14 seeking was the racial and ethnic breakdown of all of the

15 employees in the unit in which he worked.

16         THE COURT:  Okay.  What was the name of that unit?

17         MS. SHELTON:  ACX-20.

18         THE COURT:  ACX-20.  And your response is that you

19 have identified the only comparable employee.  Right?

20         MS. SHELTON:  Yes, Your Honor.

21         THE COURT:  Okay.  I do have an issue with this, and

22 I want to hear from Mr. Friedman on this, because I don't think

23 a defendant can unilaterally determine who is a, quote/unquote,

24 comparable employee to the plaintiff.  Mr. Friedman, I want to

25 hear from you on this issue about what it is you're asking for.

1                          (Pause)

2              MR. FRIEDMAN:  We're asking for the identity of --

3  the composition of the workforce by numbers of employees in

4  each racial --

5              THE COURT:  Okay.

6              MR. FRIEDMAN:  -- category.

7              THE COURT:  And is this in ACX-20?

8              MR. FRIEDMAN:  Yes.

9              THE COURT:  Now, what is that?  Is that the name of a

10 group?

11             MR. FRIEDMAN:  Yes, it's --

12             MS. SHELTON:  Your Honor, I was trying to find a

13 schematic.  There was a schematic that shows the organizations.

14 This is the organization which plaintiff worked for, and it

15 showed, you know, the chains above it.

16             THE COURT:  How big of a group is that, Ms. Shelton?

17             MS. SHELTON:  It's my understanding it was like

18 between 20 and 30 people and perhaps plaintiff knows better.

19             MR. FRIEDMAN:  Sixty-five people.

20             THE COURT:  Sixty-five people.  Okay.  Now, what was

21 plaintiff's position within this group?

22             MR. FRIEDMAN:  He was the IT Manager.

23             THE COURT:  Okay.  What did this group do?  What was

24 the purpose of the group?

25                          (Pause)


                    J&J COURT TRANSCRIBERS, INC.

1           MR. FRIEDMAN:  The group managed the network.

2           THE COURT:  Okay.  Let's go off the record a second.

3  I want to take this call, and after I take this call --

4                      (Off the record)

5           THE COURT:  We're on the record.

6           MR. FRIEDMAN:  To expand on that, they managed the

7  network which includes telecommunications, security e-mail --

8           THE COURT:  Okay.

9           MR. FRIEDMAN:  -- web services, and database

10 administration.

11          THE COURT:  Now, Mr. Friedman, what is the relevant

12 time period that you're seeking information about?

13          MR. FRIEDMAN:  The five-year period preceding the

14 date of plaintiff's termination.

15          THE COURT:  Plaintiff was terminated when?

16          MR. FRIEDMAN:  April 23rd, 2004.

17          THE COURT:  Two thousand?

18          MR. FRIEDMAN:  Four.

19          THE COURT:  Okay, and when did plaintiff start

20 working there?

21          MR. FRIEDMAN:  September of 2003.

22          THE COURT:  Okay, so plaintiff worked for

23 approximately --

24          MR. FRIEDMAN:  Seven and a half months.

25          THE COURT:  -- seven months -- seven or eight months.

1   Okay.  Ms. Shelton, is this information available?  I mean

2   aren't there employment-type statistics that employers are

3   required to prepare?

4            MS. SHELTON:  Actually, Your Honor, we're not longer

5   required nor do we collect that information on a mandatory

6   basis, because the collection of that information by itself has

7   been --

8            THE COURT:  How long has that been the case?

9            MS. SHELTON:  -- has been determined to be

10  discriminatory that we collect such information.

11           THE COURT:  How long has that been --

12           MS. SHELTON:  So we're sort of in a Catch 22.

13           THE COURT:  How long has that been that case?

14           MS. SHELTON:  I could certainly find out.  I don't

15  know off the top of your head.  I know it's been that way for

16  several years.

17           THE COURT:  Do you know if that was -- was that the

18  case --

19           MS. SHELTON:  I know that partial information would

20  probably be available, and, obviously, if the Court so orders,

21  we would ask the agency's Office of Civil Rights to produce

22  what information they do have.

23           THE COURT:  Okay, and what you're interested in, Mr.

24  Friedman, is what?  Specifically, what information do you want

25  about the composition of the workforce?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FRIEDMAN:  The numbers of employees by each
2    racial category, and the number of employees in each national
3    origin category.

4          THE COURT:  Well, what are the racial categories and
5    national origin categories that you're interested in?  I mean
6    suppose this government doesn't keep those statistics, do you
7    want them to go through every personnel file to see if a person
8    is a Caucasian or an Afro-America or an Indian or some other
9    racial group or national origin group?

10         MR. FRIEDMAN:  African-American and Black.

11         THE COURT:  Okay.  You just want to know how many
12   African-American were employed in this group for the five-year
13   time period that you're talking about.

14         MR. FRIEDMAN:  Well, I would also want to know what
15   the overall racial composition is and the national origin
16   composition for the reason that I --

17         THE COURT:  Of what?  Of this group?

18         MR. FRIEDMAN:  Yes.

19         THE COURT:  When you say national origin, what are
20   you talking about?

21         MR. FRIEDMAN:  Individuals whose places of birth were
22   other than the United States.

23         THE COURT:  Are you claiming that that's relevant to
24   the issues in this case?

25         MR. FRIEDMAN:  Yes.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  And you're claiming that the plaintiff

2   was discriminated against because of his national origin?

3          MR. FRIEDMAN:  Yes.

4          THE COURT:  Because he's what, not a -- not -- from

5   the particular country he's from or -- is that what the claim

6   is?

7          MR. FRIEDMAN:  He is from an African nation.  He was

8   born in Nigeria.  Yes.

9          THE COURT:  Is the plaintiff a citizen of the United

10  States?

11         MR. FRIEDMAN:  Yes, he is.

12         THE COURT:  Ms. Shelton, what I'd like you to do is

13  this.  I'd like you -- I am not asking you to go to the

14  personnel files of everyone who worked in this group to try and

15  obtain this information.  I'd like you to try and find out if

16  this information is available.  Has it been already compiled by

17  the agency.  If it has already been compiled, I think it's

18  appropriate to produce those statistics to the plaintiff --

19         MS. SHELTON:  For the --

20         THE COURT:  -- for the five years that he talked

21  about.

22         MS. SHELTON:  For the ACX-20 group, Your Honor?

23         THE COURT:  Only the ACX-20 group.  I do think that

24  it's important that the plaintiff know how many people were

25  employed in that group, so if you don't have an exact number,

24

1  someone's going to have to give an estimate.  I'm assuming, but

2  I don't know for sure, especially in light of what you said,

3  but I know historically these types of statistics have been

4  kept for private employers.  I don't know if they still do it.

5  I don't know if the government did it.  But I think it's

6  appropriate to check if the government has these statistics

7  already available just for this group for this five-year time

8  period.  And if already in existence, then the Court orders

9  that it be produced.

10      Certainly, you have to identify the number of

11  employees that were in the group.  If the statistics are not

12  otherwise available, aside from going to every individual

13  personnel file, then we're going to have to revisit the issue

14  at some time in this case, because I'm hesitant to ask the

15  government to review individual files to compile this

16  information.  But if it already is in existence, I think it

17  should be produced.  If it's not in existence, we'll address

18  the issue at another conference to discuss what you found out,

19  what's available, and then weigh the burden against the

20  relevance of the information.

21      Okay.  That takes care of Subsection D.  Now let's go

22  to E on Page 4.

23      MS. SHELTON:  Your Honor, I believe that E was simply

24  a documentary request that mirrored Issue Number -- Issue

25  Letter D --

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  Okay, so --

2            MS. SHELTON:  -- which was documents reflecting the

3  same thing.

4            THE COURT:  Same ruling.

5            MS. SHELTON:  Your Honor, just for a point of

6  clarification, all documents relating to that might --

7            THE COURT:  No, just the statistics that have already

8  been compiled.

9            MS. SHELTON:  Okay, so would a declaration including

10 the statistics suffice?  It --

11           THE COURT:  Why can't you produce the actual

12 statistics?

13           MS. SHELTON:  Well, if the statistics are produced by

14 an H.R. person opening the personnel file and looking and

15 writing it down --

16           THE COURT:  But I didn't ask you to do that.  Right?

17           MS. SHELTON:  Okay.

18           THE COURT:  I didn't ask you to do that.

19           MS. SHELTON:  So if a document exists that reflects

20 -- that has already been created that reflects the

21 statistics --

22           THE COURT:  Produce it.

23           MS. SHELTON:  -- that's the document that needs to be

24 produced.

25           THE COURT:  Correct.

                    **J&J COURT TRANSCRIBERS, INC.**

1        MS. SHELTON:  Okay.  Thank you, Your Honor.

2        THE COURT:  Correct.  If, in order to get these

3 statistics, your H.R. person has to go through individual

4 personnel files, that's the issue we're going to have to

5 revisit the next time we get together, because we have to weigh

6 the burden against the relevance of that information.  So that

7 takes care of D and E.  Now let's go to F on Page 4.

8        MR. FRIEDMAN:  F I believe refers to request for

9 production Number 6 as opposed to interrogatory Number 6.

10       THE COURT:  Ms. Shelton, what's the issue in F?

11       MS. SHELTON:  This -- "The agency did not respond to

12 interrogatory Number 6," is a line that was taken from your

13 letter to me prior to responding.  If that was an error, then

14 I've --

15       MR. FRIEDMAN:  Yes.

16       MS. SHELTON:  -- been chasing the wrong response.

17       MR. FRIEDMAN:  There was a typographical error.

18 Request for production Number 6 and 7 were the requests that

19 had not been responded to.

20       MS. SHELTON:  Okay, that's the first that I'm hearing

21 of this then.

22       THE COURT:  Okay.  What is that issue?

23       MR. FRIEDMAN:  6 is product all documents which

24 reflect or represent any formal complaint of discrimination

25 filed under the federal EEO regs by all individuals within the

1   FAA Tech Center who allege race or national origin

2   discrimination within the five-year period preceding the date

3   of plaintiff's termination.

4        THE COURT:   Okay.   How many people are employed by

5   the FAA Tech Center?

6        MS. SHELTON:   Thousands and thousands, Your Honor.

7   This is much larger than the group that he worked for.   It

8   includes independent contractors.   It includes non-employees of

9   the government.

10       MR. FRIEDMAN:   There are not thousands and thousands

11  of employees there, and the independent contractors do not file

12  formal complaints of discrimination under the EEOC regulations.

13       THE COURT:   Do you --

14       MS. SHELTON:   That he is aware of.

15       THE COURT:   What you want to know, Mr. Friedman, is

16  within this five-year time period all complaints of racial or

17  national origin discrimination that were filed?

18       MR. FRIEDMAN:   Yes.

19       THE COURT:   Now, when you say complaints, what

20  specifically are you looking for?

21                    (Off the record)

22       THE COURT:   We're back on the record.   That's the

23  last phone call interruption I'll have.   We're dealing with the

24  FAA -- complaints against the FAA for racial and ethnicity

25  discrimination.   What type of complaints are you talking about,

**J&J COURT TRANSCRIBERS, INC.**

1   Mr. Friedman?

2          MR. FRIEDMAN:  There -- federal employees have a

3   specific avenue of redress.  These are set forth in regulations

4   of the EEOC.  Non-federal employees do not have that avenue of

5   redress.

6          THE COURT:  What type of complaints are you asking

7   for?

8          MR. FRIEDMAN:  Formal complaints of discrimination.

9          THE COURT:  Is there a form?

10          MR. FRIEDMAN:  There --

11          THE COURT:  You're talking about lawsuits?  What are

12   you talking about?

13          MR. FRIEDMAN:  There is a process.  An employee must

14   first seek pre-complaint counseling.  There is a 40-day -- a

15   45-day window for the employee to do that after he perceives

16   that there is discrimination against him.  After that period he

17   files a formal discrimination complaint.  It's a formal

18   document that's filed, which is officially docketed by the

19   agency.  The agency then goes through a processing period.

20   There are -- two thirds of the individuals who are at the FAA

21   Tech Center are not federal employees.  The minority of

22   employees at the FAA Tech Center are federal employees.  So

23   we're not talking about that large numbers of people.

24          THE COURT:  Ms. Shelton.

25          MS. SHELTON:  I would just address that perhaps if it

**J&J COURT TRANSCRIBERS, INC.**

29

1   had been phrased that way, it would be different.  It says --

2   here it didn't say all federal employees within the FAA Tech

3   Center.  It said all individuals.  So that might have had

4   something to do with the over-breadth objection.  However, I do

5   note that RFP Number 6, the defendant -- and this was prior

6   counsel, prior to myself, Your Honor -- had indicated that

7   within his employment group the ACX-1, ACX-1 group that he was

8   a part of, plaintiff was the only one who had filed such a

9   complaint.

10          THE COURT:  Is that the ACX-20 group?

11          MS. SHELTON:  No, I believe the request --

12          THE COURT:  What's the difference between ACX-1 and

13  ACX-20?

14          MS. SHELTON:  ACX --

15          MR. FRIEDMAN:  AC --

16          MS. SHELTON:  ACX-20 is the smaller subgroup of which

17  the plaintiff was as part.

18          THE COURT:  Okay.

19          MS. SHELTON:  ACX-1 is a larger subgroup in that same

20  chain of command.  The FAA Tech Center is the largest of all

21  the subgroups we're talking about.

22          THE COURT:  How many people are employed in ACX-1?

23          MS. SHELTON:  That I'm -- off the top of my head,

24  Your Honor, I'm not familiar with that.

25          THE COURT:  Do you know, Mr. Friedman?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FRIEDMAN:  I would guess a few hundred people

2     maybe.  A hundred.  A hundred people possibly.

3          THE COURT:  Okay.

4          MS. SHELTON:  And it's my understanding, Your Honor,

5     that within that ACX-1 group, that larger group, but which is a

6     subset of the larger center, that plaintiff was the only one

7     who had filed such a complaint.

8          THE COURT:  In the ACX-1 group or the ACX-20 group?

9          MS. SHELTON:  According to this response, the ACX-1

10    group.

11         THE COURT:  For what time period?

12         MR. FRIEDMAN:  Where -- which one are you referring

13    to?

14         MS. SHELTON:  I'm looking at the response RFP Number

15    6.

16         MR. FRIEDMAN:  Number 6.

17         MS. SHELTON:  There is an objection, and then beyond

18    the objection on the following page, "There is none for OTA, in

19    parentheses, ACX-1, probationary employees other than

20    plaintiff."

21         THE COURT:  Well, was that limited to just

22    probationary employees?

23         MS. SHELTON:  I will confirm that fact, but my

24    understanding is that it was plaintiff alone.  But I can

25    confirm that fact.

```
 1              THE COURT:  The answer, it might a little bit
 2  ambiguous about that.
 3              MR. FRIEDMAN:  Your Honor, I am representing an
 4  individual now in Federal District Court here in Camden who was
 5  a black male, who was terminated during his probationary
 6  period.  He was the -- he was the Public Relations Officer.
 7              THE COURT:  For what, the FAA?
 8              MR. FRIEDMAN:  At the FAA Tech Center.
 9              MS. SHELTON:  Your Honor, I believe that individual
10  is identified in plaintiff's responses to a different request.
11              THE COURT:  Mr. Friedman, why are you raising that?
12              MS. SHELTON:  And that is D -- our response to D --
13              MR. FRIEDMAN:  D of what?
14              MS. SHELTON:  -- which was, "Furthermore, defendant
15  identified Reynold McPherson."  Is that the individual which
16  you --
17              MR. FRIEDMAN:  No.
18              MS. SHELTON:  -- were speaking of?
19              MR. FRIEDMAN:  No.  No, there would be -- the point
20  I'm trying to make is that the Human Resources function
21  provides advice and guidance to management officials at the FAA
22  Tech Center.  Mr. Omogbehin happens to be in a relatively small
23  sub-component of a larger group.  His allegation is that there
24  is a discriminatory mind set.  There is a atmosphere of animus
25  against African-Americans, and that's reflected in the fact
```

**J&J COURT TRANSCRIBERS, INC.**

1 that only those individuals or a disproportionately number of

2 those individuals have been terminated during their

3 probationary periods, and in order to establish that, we've

4 asked this interrogatory.  I would guess that in terms of

5 employees who were terminated at the entire FAA Tech Center

6 during their probationary period, that the numbers would be

7 incredibly small.

8           THE COURT:  Okay.  I'm not sure what request we're

9 now talking about.  Let's get back on focus here.  I thought we

10 were up to F, and that there was apparently some sort of

11 typographical error, and we're no longer talking about

12 interrogatory Number 6.  So what alleged deficiency are we

13 addressing now?

14           MR. FRIEDMAN:  We are talking about request for

15 production Number 6, I believe, and we're asking --

16           MS. SHELTON:  Which is not addressed in this

17 letter --

18           THE COURT:  Right.

19           MS. SHELTON:  -- so the Court wouldn't be familiar --

20           THE COURT:  Right.

21           MS. SHELTON:  -- with what the request was.

22           THE COURT:  Right.  And --

23           MR. FRIEDMAN:  Right.  I had --

24           THE COURT:  That's fine.  That happens, Mr. Friedman.

25           MR. FRIEDMAN:  -- mistakenly referred to it.  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1             THE COURT:  And what request 6 is, all complaints of

2    discrimination regarding ethnicity and national origin to the

3    FAA?

4             MR. FRIEDMAN:  FAA Tech Center, but I'm -- I am --

5    when I said filed pursuant to 29 CFR Part 16.14, the only

6    individuals who would have standing to do that are federal

7    employees.

8             THE COURT:  29 CFR --

9             MR. FRIEDMAN:  Part 16.14.  Those are the regulations

10   promulgated by the EEOC which sets forth the procedure by which

11   a federal employee can raise a Title 7 matter.

12            THE COURT:  Ms. Shelton, are those -- is that

13   information available, the identity of the individuals who

14   filed race and national origin discrimination complaints

15   pursuant to 29 CFR 16.14 for the five years that Mr. Friedman's

16   talking about?  Is that available?

17            MS. SHELTON:  Your Honor, because this is the first

18   time I'm hearing of it, I hesitate to answer without having

19   accurate information.

20            MR. FRIEDMAN:  I --

21            MS. SHELTON:  I don't know if what he's looking for

22   are numbers, names.  I don't know how the -- if these files are

23   kept within their official personnel file, whether there is a

24   privacy issue with that for the individuals who chose not to go

25   forward with say a District Court complaint.  I would just

1  hesitate to say what I could or couldn't produce without

2  talking to the agency.

3          MR. FRIEDMAN:  As --

4          THE COURT:  Okay.  Now what is it you want from these

5  individuals, Mr. Friedman?

6          MR. FRIEDMAN:  I had wanted all formal complaints

7  filed by individuals who had alleged that they were

8  discriminated against either based on their race or their

9  national origin.

10          THE COURT:  What I'd like you to do, Ms. Shelton, is

11  investigate whether information is available about who and how

12  many of these individuals filed these race and national origin

13  complaints against the FAA regarding twenty -- pursuant to 29

14  CFR 16.14.  And the next time we get together we'll readdress

15  this issue and determine what, if anything, has to be produced.

16          MS. SHELTON:  Your Honor, I have two questions.  One,

17  you want those who filed formal EEO complaints not just those

18  who sought EEO counseling.

19          MR. FRIEDMAN:  Correct.

20          MS. SHELTON:  Is that correct?

21          MR. FRIEDMAN:  Correct.

22          MS. SHELTON:  Okay.

23          MR. FRIEDMAN:  That is correct.

24          MS. SHELTON:  And two, when you say who and how many,

25  are you looking for names specifically, or are you looking for

35

1   race and national origin?

2           THE COURT:  Well, these are individuals who filed

3   race and national origin complaints.  Before we get into

4   whether any additional information, see if you can identify the

5   names of these people and how many were filed, if any, and then

6   we can discuss what information, if any, has to be produced

7   regarding the complaints.  But until we have a handle on what

8   we're talking about, I think it's premature to make a

9   determination of what has to finally be produced.  So defendant

10  will look into this issue as they will look into the other

11  issue we identified, statistics and Subsection D and E, and

12  we're going to revisit those issues next time we get together.

13  Let's go to G.

14          MR. FRIEDMAN:  G is request for production Number 7,

15  which Ms. Shelton did not address, because I had mistakenly

16  referred to it as interrogatory Number 7.

17          THE COURT:  And what is Request 7?

18          MR. FRIEDMAN:  We were also requesting documents

19  which concern employees' complaints of discrimination that were

20  filed outside of the formal EEO process.  So that, for

21  instance --

22          THE COURT:  Lawsuits?

23          MR. FRIEDMAN:  Lawsuits or if an employee were part

24  of a union and --

25          THE COURT:  Okay.  Let's limit request for production

1  to lawsuits -- just lawsuits.  The same thing, Ms. Shelton.

2  Just see if you can obtain how many and who, and next time we

3  get together we'll discuss what, if any, information regarding

4  these complaints have to be -- has to be produced.

5          MS. SHELTON:  Your Honor, any lawsuits based on what,

6  not Title 7, on something --

7          THE COURT:  No, lawsuits regarding race and ethnicity

8  discrimination not Title 7.  Just race discrimination and

9  national origin discrimination.  Those were the claims in the

10 complaint.

11         MS. SHELTON:  I understand.  I just want it

12 clarified, because I believe Mr. -- I don't want to produce

13 something or bring something that he's not expecting.  I

14 believe he indicated he's also looking for, as an example,

15 union grievances --

16         THE COURT:  No, I think that's over broad.

17         MS. SHELTON:  -- in which these were also alleged.

18         THE COURT:  We're not going to produce that.  You

19 don't have to look into that.

20         MS. SHELTON:  Okay, so this --

21         THE COURT:  Limit it to formal civil lawsuits.

22         MS. SHELTON:  That would be a subset of the prior

23 issue we just talked about.

24         THE COURT:  Correct.

25         MS. SHELTON:  Okay, so any of those that went on to a

**J&J COURT TRANSCRIBERS, INC.**

1 further District Court complaint.  Okay.

2          THE COURT:  Okay.  What is the issue in Subpart H,

3 Ms. Shelton, on Page 5?

4          MS. SHELTON:  Request for production Number 8.

5                        (Pause)

6          MS. SHELTON:  Your Honor, generally, one of over

7 breadth, and perhaps plaintiff can help clarify specifically

8 what it is that he's seeking.

9          THE COURT:  What are you seeking, Mr. Friedman, in

10 Request 8?

11         MR. FRIEDMAN:  We're seeking documentation to show

12 that the termination of the plaintiff obviously was pretextual.

13 All of the information that we're seeking deals with that, and

14 it's very difficult to --

15         THE COURT:  So tell me what you're asking for in

16 Request 8.

17         MR. FRIEDMAN:  We're asking for documents relating to

18 employees who were either terminated or who resigned after

19 being informed they were going to be subject to discipline

20 which could have led to termination.

21         THE COURT:  Plaintiff's request for this information

22 is denied.  It's overkill as far as the Court concern.  Its

23 relevance is outweighed by its burdensomeness.  Its relevancy

24 is questionable.  And we've already talked about investigating

25 lawsuits and claims, and in the Court's view, exercising its

38

1    discretion, not sufficient.

2              MR. FRIEDMAN:  May --

3              THE COURT:  Let's go on, Mr. Friedman.

4              MR. FRIEDMAN:  May I be heard --

5              THE COURT:  I don't want to go back.

6              MR. FRIEDMAN:  -- at the least to argue why it's --

7              THE COURT:  Mr. Friedman, I'm not going back.

8              MR. FRIEDMAN:  -- why it is --

9              THE COURT:  Mr. Friedman, listen to me.  I make my

10   ruling.  We're not going back.  We're going forward.

11             MR. FRIEDMAN:  Okay.

12             THE COURT:  Request --

13             MR. FRIEDMAN:  Your Honor, I only ask that prior to

14   making a ruling could I be heard?  This -- it appears as though

15   you're making important decisions concerning my client's need

16   or belief that he needs certain information, and I have not

17   been able to express why.  You had asked me what I was asking

18   for.  You hadn't asked me why I was asking for it and the

19   relevance of what --

20             THE COURT:  I understand, Mr. Friedman.  I understand

21   why you're asking for this information.

22             MR. FRIEDMAN:  Could you --

23             THE COURT:  I hear your state --

24             MR. FRIEDMAN:  Could you explain to me why then?

25             THE COURT:  Mr. Friedman, I made my ruling.  I said

39

1  it many, many times on the record.  After I make my ruling,

2  we're not going back and rearguing the point.  We're going

3  forward.

4           MR. FRIEDMAN:  Your Honor, I am not arguing with

5  that.

6           THE COURT:  Okay.  Let's take --

7           MR. FRIEDMAN:  I only --

8           THE COURT:  Let's take a recess for five minutes.

9  Mr. Friedman, compose yourself.  I ask that you think about

10 what you're saying, and we'll come back and finish this

11 argument.  We'll adjourn for five minutes.

12                     (Recess)

13          THE COURT:  We're up to --

14          MS. SHELTON:  I believe it was I, Your Honor.

15          THE COURT:  I'm a little confused now.  We did -- did

16 we do H?

17          MS. SHELTON:  Your Honor, made a ruling with respect

18 to H, which plaintiff's counsel --

19          THE COURT:  Is that where I denied the request?

20          MS. SHELTON:  Yes, Your Honor.

21          THE COURT:  Okay.  We're up to I.  What is the issue,

22 Ms. Shelton?

23          MS. SHELTON:  I believe it is the same issue as H

24 limited to the subset of probationary employees for all the FAA

25 Tech Center.

1           THE COURT:  And what is it that the plaintiff is

2    asking for?

3           MS. SHELTON:  Apparently, all documents relating to

4    people who were terminated or resigned after threat of

5    termination.

6           THE COURT:  Request denied for the same reasons as

7    Request 8.

8           MR. FRIEDMAN:  Your Honor, since it was I who had

9    requested the conference, the cause of the dispute that I tried

10   to resolve, I would ask the Court's permission to have me

11   explain the request and the purpose for the request.

12          THE COURT:  Isn't Request -- isn't request for

13   documents Number 9 a subset for documents Number 8?

14          MR. FRIEDMAN:  No, it's -- it is a request to show

15   that Mr. Omogbehin's letter of termination did not contain any

16   specifics whatsoever.  The purpose is to show that when the

17   agency -- when the FAA Tech Center terminated all other

18   employees, it gave specific reasons, which would indicate that

19   there was a pretextual reason to get rid of Mr. Omogbehin.  And

20   that was the purpose for the request for -- the request for

21   production Number 8, also, to show that the agency didn't have

22   a valid reason.  It only had a pretextual reason.

23          So in order to justify the termination of Mr.

24   Omogbehin, which it could've done during the probationary

25   period it merely had to send him a letter saying we no longer

**J&J COURT TRANSCRIBERS, INC.**

 1    need your services without any explanation at all.  And it's

 2    Mr. Omogbehin's contention that the agency -- that he was

 3    treated differently from everyone else who was terminated under

 4    the same circumstances where they got letters of explanation,

 5    they were told that they had performance deficiencies, that

 6    they had problems.

 7             THE COURT:  Okay.  The Court determines that

 8    plaintiff's request Number 8 and Number 9 is denied.  The Court

 9    believes it's overkill.  This issue can be explored with the

10    defendants' witnesses at their depositions.  You can inquire of

11    the relevant employees from defendant why they said what they

12    said in their letters of termination, or probation or what have

13    you, why they didn't say what they said -- why they didn't say

14    something else in their letters, whether other employees were

15    given more detailed letters, whether there was any type of

16    policy or procedure that when they sent letters of that type

17    they had to provide more detail.  The Court denies the request

18    for documents in request Number 8 and 9.  We're up to J.  What

19    is the issue here, Ms. Shelton?

20             MS. SHELTON:  Your Honor, this is the issue of the

21    tape.

22             THE COURT:  Okay.  Let's hear some argument on this.

23    What is the defendants' position with regard to this issue?

24             MS. SHELTON:  Specifically, with response to Issue J

25    which says the agency did not respond to a request for

                    **J&J COURT TRANSCRIBERS, INC.**

42

1  production Number 10.  A request for production Number 10 asks

2  for a copy of the backup tape containing the e-mail files for

3  Thomas Christian, Alan Cannazarro, Ron Smith and Cindy Kaiser

4  Ellis, and to identify the Lotus Notes administrator that was

5  responsible for retrieving the data from the backup tape.

6          THE COURT:  Okay.

7          MS. SHELTON:  That was the request.  And the

8  defendants --

9          THE COURT:  So the plaintiff want --

10         MS. SHELTON:  I'm sorry.

11         THE COURT:  Plaintiff wants the backup tapes for

12  these individuals that you've identified.

13         MS. SHELTON:  That he has identified.

14         THE COURT:  That he has identified.

15         MS. SHELTON:  Yes.

16         THE COURT:  And are these individuals relevant to his

17  termination decision?

18         MS. SHELTON:  Yes, Your Honor.  But defendants'

19  response was that the tape itself -- there is not a tape for

20  each file for each person.  There is one tape on which all of

21  the files of all of the employees of the Tech Center is

22  located.  And because of the Privacy Act, relevancy and

23  security concerns they could not produce that tape itself, and

24  so the Lotus Notes administrator who was recently deposed by

25  plaintiff's counsel took that tape, loaded it onto the system,

**J&J COURT TRANSCRIBERS, INC.**

1   and then downloaded the files for each of these individuals

2   onto a disk.

3         Then the agency counsel, because these are HR

4   representatives, three of these four named individuals are HR

5   representatives, agency counsel reviewed the e-mails on those

6   CDs of Thomas Christian, Alan Cannazarro, and Ron Smith, I

7   believe, who are HR individuals, reviewed those for privacy

8   concerns, anything related to Mr. Omogbehin versus things that

9   were not related to him that were private information in

10  correspondence between non-witnesses, people not related to

11  this case and HR.  And I believe that agency counsel testified

12  that there were several hundred e-mails of these people on the

13  files of which a very small number were produced because those

14  were the numbers that were related to Mr. Omogbehin.

15        So, this specific request asked for the tape itself

16  regarding these four individuals to which we've explained it's

17  physically impossible to produce a tape.  To the extent that

18  we've produced these on CD, plaintiff's counsel believes that

19  we may have withheld things that were related or that we may

20  have hidden, I believe, or not produced all the relevant

21  evidence.  We did produce agency counsel to be deposed on what

22  he produced and what he didn't to try and satisfy that

23  obligation.  He wasn't inquired of that.

24        If plaintiff's counsel still believes that something

25  has been withheld we would be willing to produce all of the

**J&J COURT TRANSCRIBERS, INC.**

 1    e-mails to the Court, in-camera, to determine whether or not we

 2    have made a full production.  I'm not inclined to give all of

 3    the HR e-mails to plaintiff.  I don't believe I can do that.

 4            THE COURT:  We'll hear from the plaintiff, but let me

 5    make sure I understand the defendants' position.  The

 6    defendants' position is that there's not a separate backup tape

 7    for each of these employees, that there's a general backup tape

 8    which would include not only these identified employees, but

 9    other employees not relevant to this case.

10            MS. SHELTON:  That's correct, Your Honor.

11            THE COURT:  That rather than produce the general

12    backup tape the defendant undertook to download to disks the

13    e-mails from these identified individuals from the backup

14    tapes, and then someone checked those e-mails from these

15    identified individuals to identify those that related to this

16    plaintiff.

17            MS. SHELTON:  That's correct.

18            THE COURT:  And they were produced to the plaintiff.

19            MS. SHELTON:  That's correct, Your Honor.

20            THE COURT:  Let's hear plaintiff's position.

21            MR. FRIEDMAN:  The defendants' position is not what

22    it had represented when it responded to the request for

23    production.  The defendants' response was not a response, but

24    was an objection.  The sum total of the objection was,

25    "Defendant objects to this request because it's not likely to

**J&J COURT TRANSCRIBERS, INC.**

1  lead to discoverable information to relevant claims or defenses

2  of any party.  Further, defendant objects because it is unduly

3  burdensome."

4          MS. SHELTON:  There is a further response to that.

5          THE COURT:  Okay.

6          MR. FRIEDMAN:  Oh, I'm sorry.

7          THE COURT:  Talk to the Court.  Mr. Friedman, what I

8  would like to focus on is, what do you want that you have not

9  already received?

10         MR. FRIEDMAN:  We have not gotten the backup tape

11 which is the crucial piece of evidence.  All of the

12 electronically stored backup information has never been

13 produced.  The agency has represented that it has transferred

14 information from this physical, relatively small electronic

15 media into CDs which it has given to Mr. Omogbehin.  Mr.

16 Omogbehin contends that the information that was contained on

17 CDs was not the complete information on the backup tape.

18 Moreover --

19         THE COURT:  What's the basis for saying that?

20         MR. FRIEDMAN:  There were subdirectories in his own

21 file which were empty.  There was a representation at a

22 deposition that a mirror image of his hard drive was made when

23 he actually wanted a -- to have a mirror image of his hard

24 drive.  The CD did not contain a mirror image.

25         THE COURT:  I thought we're talking about the e-mails

1  of not the plaintiff.  Right now we're talking about e-mails of

2  other individuals.

3           MR. FRIEDMAN:  Yes.

4           THE COURT:  Let's talk just about that.

5           MR. FRIEDMAN:  Okay.  May I explain?  It's very

6  difficult to give a fast food version, but generally there is

7  one backup tape that contains all of the e-mails of the FAA

8  Tech Center employees, anyone at the FAA Tech Center who has

9  communicated.

10          THE COURT:  Right.  So you would acknowledge that

11  that backup tape contains a multitude of completely irrelevant

12  information to this case?

13          MR. FRIEDMAN:  Yes.  And we have asked for the backup

14  tape so that we could extract from the backup tape, using our

15  experts.  We have requested to extract the electronically

16  stored information relating to not only these individuals, but

17  to Mr. Omogbehin, Shelly Yak, Robert Lynn, Gary Albert and a

18  whole host of other individuals who --

19          THE COURT:  Do you have any reason to believe that

20  the efforts that the defendant undertook to download from the

21  backup tapes the information you requested was not done?  And

22  didn't you depose someone on that?

23          MR. FRIEDMAN:  Yes.  You asked two questions.  Yes,

24  we had deposed someone.  And yes, we do believe that there was

25  information that was not given to us from the backup tapes.

1   And the backup tapes were missing archival information.  Not

2   only that, but there was a backup in the network system that

3   was never preserved or the agency has not produced that

4   information.  At the outset of the litigation Mr. Omogbehin,

5   without presence of counsel, because of his belief that his

6   termination was unfair, did what us lawyers refer to as

7   preparing a litigation hold letter.  And I referred to that in

8   the last two sessions that we had --

9            THE COURT:  Stay there.  Stay there.

10            MR. FRIEDMAN:  Mr. Omogbehin was terminated on April

11   the 23rd, 2004.  On April the 27th he sent essentially a

12   litigation hold letter because he was escorted out of the

13   facility --

14            THE COURT:  Okay.

15            MR. FRIEDMAN:  -- without any forewarning, without

16   any opportunity to take whatever materials he felt was

17   important.

18            THE COURT:  Okay.  So, you're claiming that -- are

19   you claiming that there were e-mails from the plaintiff that

20   were not produced?

21            MR. FRIEDMAN:  Yes.  Yes.

22            THE COURT:  Well, then file a spoliation motion.

23            MS. SHELTON:  Your Honor --

24            MR. FRIEDMAN:  And that -- in order to confirm that,

25   the backup tapes --

1          THE COURT:  Mr. Friedman, simply based on your

2    client's belief that he didn't get everything he was supposed

3    to, I can't order the defendant to produce its backup tapes for

4    thousands of employees that have nothing to do with this case.

5    They have represented that they have backed up to disks the

6    information on the backup takes from these HR people that

7    you've asked about.  That they have backed up to these disks

8    all the information on the backup tapes regarding the

9    plaintiff.  Simply based on your supposition that they didn't

10   do a complete job, I'm not going to order that they produce

11   this multitude of irrelevant information, private information,

12   for your client to review.

13          MR. FRIEDMAN:  We are not interested in the multitude

14   of private information that's not related to this case.

15   There's one backup tape and the backup tape -- in the

16   electronic world we have the ability to be able to extract

17   information that is relevant to a particular issue.  For

18   instance, we all know how to access WestLaw if we're doing

19   legal research.  We don't have to look through every type of

20   court reporter system in every state, in every federal

21   jurisdiction in order to do a search.  It is the same with

22   backups.  There are differential searches, there are ways to

23   extract information from backup tapes.

24          THE COURT:  Okay.  So, is it your position that your

25   expert -- is your expert the plaintiff or somebody else?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FRIEDMAN:  No.  We --

2          THE COURT:  You have an outside expert.

3          MR. FRIEDMAN:  Yes.

4          THE COURT:  Okay.  So, is it your position that your

5   outside expert can take this tape -- what do they do with it,

6   do they download it into your computer?

7          MR. FRIEDMAN:  No.  They would create a virtual

8   environment which is identical to the environment at the FAA --

9          THE COURT:  And how long does that take?

10         MR. FRIEDMAN:  The -- a matter of hours.

11         THE COURT:  Can that be done in this courtroom?

12         MR. FRIEDMAN:  Yes.

13              (Attorney/client conversation)

14         MR. FRIEDMAN:  Okay.  It would have to be done in a

15  network environment so that, for instance, if the expert were

16  to enter the premises of the FAA and under the aegis of the FAA

17  and perhaps the Court even, the backup could be performed.

18         THE COURT:  Ms. Shelton.

19         MS. SHELTON:  Your Honor, there are several issues

20  raised by this.  I'm not quite sure where to start.  With

21  respect to what plaintiff's counsel has most recently discussed

22  and how certain files from this tape can be downloaded and

23  extracted, what he is describing is the exact process that

24  Cleave Laswell undertook at the FAA with this backup tape.

25  Cleave Laswell was deposed by plaintiff's counsel regarding his

**J&J COURT TRANSCRIBERS, INC.**

1  efforts and what he physically did to do this.  And essentially

2  what plaintiff's saying is, well, we've heard you, you've told

3  us how you did, we don't trust you anyway, we want our own

4  people to do it.  So, that's one issue.  Exactly what he's

5  asking for has already been done.

6       The second issue, there's no way the FAA Tech Center

7  who's responsible for computer support for, at a minimum, you

8  know, every airport traffic control center in the country is

9  going to let a non-employee who's not been screened for

10  security come in and play with their computers.  It's simply

11  not something that can happen, physically.  To the extent that

12  he's looking for his people to watch our people do the

13  extraction again because he doesn't believe that we did it

14  right the first time, that's something I'd be willing to

15  discuss with the agency.  But, again, it involves a non-secure,

16  non-authorized, unscreened person coming in and taking a look

17  at our system, which frightens me, frankly.

18       Second of all, we have admitted that we did not

19  produce everything from those files.  So, we've stated that

20  there were hundreds -- in the depositions that plaintiff took,

21  there were hundreds of e-mails for these four people that were

22  downloaded to these disks for which agency counsel then

23  reviewed and only physically produced the ones that related to

24  Mr. Omogbehin.  So, even if this extraction is done again by us

25  under their supervision, by them, by the Court, by anyone else,

1  there will be again those several hundred e-mails downloaded to

2  disks and we're still left with the situation that there are

3  relevant -- irrelevant private e-mails of other individuals.

4  We've already got those disks --

5         THE COURT:  I understand.

6         MS. SHELTON:  -- I'd be happy to submit those to the

7  Court for in-camera review.

8         THE COURT:  No.  Mr. Friedman --

9         MS. SHELTON:  We admit that we have not produced all

10 of those e-mails with respect to these four.

11        THE COURT:  -- you deposed this gentleman, did you

12 identify deficiencies in his procedure, or is it you just want

13 to double check what he did?

14        MR. FRIEDMAN:  No.  He had indicated that he had

15 performed a mirror image.  He had created a mirror image of --

16        THE COURT:  Okay, here's what we're going to do.  Mr.

17 Friedman, I am granting the plaintiff leave to file a motion

18 regarding this backup tape issue.  I don't completely

19 understand it.  Each of you should have an opportunity to

20 respond to each other's arguments.  It seems to be an important

21 issue as far as you're concerned.  I think we need additional

22 briefing and additional factual support on this issue.  So, you

23 are granted leave to file a motion to compel regarding your

24 request for the backup tapes and information on the backup

25 tapes.  We'll circle back at the end of this conference and

1 talk about timing, when you're going to do that.

2          MR. FRIEDMAN:  There are --

3          THE COURT:  Yes, Ms. Shelton.

4          MS. SHELTON:  I'm sorry.  With respect to this

5 motion, it raises another point that I had not addressed which

6 is there is some confusion of the issues.  This production for

7 documents refers to the backup tape for the Lotus Note system.

8          THE COURT:  Okay.

9          MS. SHELTON:  Then I have also heard plaintiff's

10 counsel speak about the mirror image of his hard drive which is

11 there are three places -- and this was all covered in the

12 recent depositions -- three places where e-mails could have

13 been stored, one of which is this Lotus Notes backup tape.

14 That's my understanding of what this dispute was about.  There

15 is also his hard drive, his physical computer where he could

16 have downloaded them to his hard drive as opposed to having

17 them being stored on the Lotus Notes system.

18          There is also a backup tape that backs up, not just

19 the e-mail, but everything in case the FAA had a terrible

20 blackout, was destroyed by some act of God.  We have tapes that

21 backup all the work on this system, not just e-mail, but your

22 Word Perfect, everything, which are sent off-site and preserved

23 for a period of time and then recycled.  So, there are three

24 areas where these e-mails are stored.  This was all discussed

25 in depositions.  The Court's not familiar with it because we

53

1    haven't addressed it here.  But, I want to make sure that I'm

2    clear on what the motion is regarding, because it's our

3    understanding that this request for production, Number 10, was

4    with respect to the backup tape of the Lotus Note system which

5    is what the discussions have been about.  To the extent he's

6    seeking --

7              THE COURT:  I'd like to make it easy.  Any issue

8    regarding backup tapes may be the subject of your motion, Mr.

9    Friedman.  Nothing else unless I specifically grant leave.  The

10   Court believes that to date thus far in this argument it has

11   sufficient information to rule on the issues I ruled.  I'm not

12   going back on those rulings.  But, with this issue regarding

13   backup tapes and requests, I'm not comfortable that I

14   understand the issue well enough to make a ruling.  So, Mr.

15   Friedman, you can file a discovery motion regarding any request

16   for information that involves backup tapes, whether it be the

17   Lotus Notes, the hard drive or this other backup system.

18             Let's go on because maybe some of the other issues

19   that are in this letter also involve the backup issue.  K, Ms.

20   Shelton, what's issue K on Page 6?

21             MS. SHELTON:  Plaintiff was seeking that defendant

22   produce all copies of documents -- of all documents including

23   agency manuals, policies, procedures, directives -- there's

24   other things -- which describe the performance management

25   system, including, but not limited to description, purpose,

54

1    implementation, management, responsibilities, documentation,

2    et cetera.

3            THE COURT:  What is it you want, Mr. Friedman?

4            MR. FRIEDMAN:  There are agency policies, written

5    authorities, rules, regulations relating to disciplining of

6    employees, treating problematic employees, what actions can be

7    taken against problematic employees.

8            THE COURT:  Do those written rules exist with regard

9    to probationary employees?

10            MS. SHELTON:  Well, Your Honor, I believe -- I think

11   we've subsequently produced some documents that I believe are

12   in the nature of what he is looking for.  We would still object

13   to these as relevant because he was a supervisory employee to

14   which these didn't apply, but --

15            THE COURT:  Supervisory or probationary?

16            MS. SHELTON:  He was both.

17            THE COURT:  Okay.

18            MS. SHELTON:  He was a supervisor, but he was under a

19   probationary period.

20            THE COURT:  You only have to produce the written

21   documents regarding the plaintiff's position, none other.

22            MS. SHELTON:  Regarding?

23            THE COURT:  The plaintiff's position.  Probationary

24   supervisor position that the plaintiff was in.

25            MS. SHELTON:  We have produced his specific

55

1  performance plan.

2          THE COURT:  Are there procedures regarding the

3  discipline of probationary supervisors?

4          MR. FRIEDMAN:  Your Honor, I don't believe that there

5  is a subcategory in any of the literature dealing with

6  probationary supervisors.  Normally, the categories are

7  probationary employees which don't enjoy the same procedural

8  rights as employees who are not --

9          THE COURT:  Okay.  That's fair.  Is there written

10  documentation regarding the discipline system for probationary

11  employees that would include the plaintiff?

12          MS. SHELTON:  Your Honor, because he was a

13  supervisory employee, I believe we would say, no.  My

14  understanding is no, that there is a system for the review and

15  evaluation.  There are procedures regarding non-management

16  employees, and I believe that's what I produced to Dennis since

17  this letter was submitted to the Court.

18          THE COURT:  Okay.  That's all I'm directing the

19  defendant to produce any written disciplinary procedures that

20  would apply to the position plaintiff held when he was

21  employed.

22          MR. FRIEDMAN:  Your Honor, may I just very briefly

23  say, Ms. Shelton has made a representation that I do not

24  believe is supported.  I don't believe there are any federal

25  rules relating to probationary supervisory employees which are

**J&J COURT TRANSCRIBERS, INC.**

56

1    any different from probationary non-supervisory employees.  The

2    rules relate to probationary employees and that there is no

3    distinction within that general category.

4              THE COURT:  Okay.  Maybe you didn't hear my direction

5    or order, Mr. Friedman.  I'm ordering the defendant to produce

6    the written policies and procedures that pertain to discipline

7    for the position that plaintiff held; so, anything that would

8    address plaintiff's position.  It doesn't have to be specific

9    to a supervisor so long as it pertained to plaintiff's

10   position.

11             MR. FRIEDMAN:  Could I ask for clarification.  By the

12   term "position", do you probationary status?

13             THE COURT:  No, the job he held.  Whatever job he

14   held.

15             MR. FRIEDMAN:  My understanding is that there are no

16   regulations or rules addressing disciplining of people in a

17   certain type of job.  That there's a broad policy and the

18   policy pertains to either probationary employees or employees

19   who are --

20             THE COURT:  So, if there is a policy that pertains to

21   discipline for probationary employees, wouldn't that also apply

22   to plaintiff's position?

23             MR. FRIEDMAN:  Yes.

24             THE COURT:  And that's what I ordered to be produced,

25   Mr. Friedman, if it pertains to plaintiff's position.

**J&J COURT TRANSCRIBERS, INC.**

57

1          MR. FRIEDMAN:  You mean status.  Do you mean status?

2          THE COURT:  I think position would include his

3 status.

4          MR. FRIEDMAN:  So, then -- and I apologize for being

5 thick about this, but in that request that you are making of

6 the defendant you are ask -- that would include any written

7 authority relating to discipline as it pertains to probationary

8 employees such as Mr. --

9          THE COURT:  Only pertaining to the plaintiff.  If

10 there's a probationary policy for a pilot that would not

11 pertain to your client, that does not have to be produced.  If

12 there's a probationary policy for someone in the plaintiff's

13 position, it has to be produced.  My ruling is clear.  Let's

14 move on.  L; Page 6.  What's the issue, Ms. Shelton?

15          MS. SHELTON:  All documents -- plaintiff had

16 requested that defendant produce all documents, including

17 agency manuals, policies, procedures, et cetera, which

18 represent all policies for storing, retrieving, accessing,

19 retaining and disposing of records in the category within the

20 system of records pertaining to the disciplining of employees.

21          THE COURT:  You want the record retention policies

22 for discipline records?

23          MR. FRIEDMAN:  Yes.

24          THE COURT:  Do they exist, Ms. Shelton?

25          MS. SHELTON:  I believe -- I'm sorry, I'm looking at

**J&J COURT TRANSCRIBERS, INC.**

1 the request for production.  Our response was that there was no

2 such written policy, but that HR certainly could be deposed

3 about their practices.

4          THE COURT:  Okay.  So you're representing that those

5 written policies do not exist.

6          MS. SHELTON:  Yes, Your Honor.

7          THE COURT:  I can't order them to -- Mr. Friedman, I

8 can't order the defendant to produce documents that don't

9 exist.

10          MR. FRIEDMAN:  Obviously, that is a tautology, or

11 it's an immutable truth that something that does not exist

12 cannot be produced.  But, the underlying premise, I do not

13 believe, is correct.

14          THE COURT:  Okay.  Do you know what I do in

15 situations like that, because this is not infrequent?  Counsel

16 has made a representation that the records don't exist.  You

17 have an opportunity to explore that at depositions.  I'm

18 directing the defendant to produce the record retention policy

19 -- written record retention policy regarding discipline

20 records.

21          MR. FRIEDMAN:  Okay.  That's fair.

22          THE COURT:  If they represent it doesn't exist, you

23 have the opportunity to explore that at deposition.

24          MR. FRIEDMAN:  Thank you.

25          THE COURT:  M; Page 7.  What's that issue, Ms.

1  Shelton?

2          MS. SHELTON:  I'm sorry, Your Honor, if you could

3  just give me one second.

4                    (Pause)

5          MS. SHELTON:  Plaintiff was seeking that defendant

6  produce, in electronic format, all documents describing or

7  representing -- or concerning the time and attendance records

8  for contractors and employees identified in the work log for

9  ACX-20, the group in which plaintiff worked, for the period

10  September 2003 through April 2004.

11          THE COURT:  And what's the relevance of this, Mr.

12  Friedman?

13          MR. FRIEDMAN:  As is set forth in the records,

14  plaintiff has asserted that the information sought will show

15  that Gary Albert approved time for contract employees, and Bob

16  Lynn approved time for a contract and FAA employees, including

17  overtime, in violation of the FAA policy, and that the agency

18  used this alleged violation committed by plaintiff to justify

19  his termination.

20          THE COURT:  So, is it your position that other

21  similarly situated employees were treated differently from your

22  client?

23          MR. FRIEDMAN:  Yes, and also the fact that there was

24  a policy in place, and the policy was enforced against my

25  client alone and no one else.

                J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Do you have that policy?

2          MR. FRIEDMAN:  Do I have a copy of the --

3          THE COURT:  Is it a written policy?

4          MR. FRIEDMAN:  The management officials testified

5    that there was a policy.  And I'm assuming that there is a

6    written policy, and management is enforcing --

7          THE COURT:  Can you identify specific instances when

8    this happened?

9          MR. FRIEDMAN:  That is the purpose of seeking the

10   information.

11         THE COURT:  Sounds like a fishing expedition.  Can

12   you identify specific instances when this happened?

13         MR. FRIEDMAN:  Yes.  Mr. Omogbehin would testify that

14   he has knowledge, without having the hard evidence, that Bob

15   Lynn approved the time and attendance for FAA employees and

16   that Gary Albert approved time and attendance --

17         THE COURT:  That's very general.  I need more

18   specifics.  Can you identify a person, a time, a date?

19         MR. FRIEDMAN:  Without being able to get the

20   documents from the FAA he would not have specific recall.

21         THE COURT:  Have you deposed Mr. Albert or Mr. Lynn

22   yet?

23         MR. FRIEDMAN:  Not on any of the substantive issues.

24         THE COURT:  Okay.  My ruling is that this request, M,

25   is denied without prejudice.  That after the plaintiff deposes

**J&J COURT TRANSCRIBERS, INC.**

61

1  Mr. Albert and Mr. Lynn I'll entertain a request for specific

2  information if there's some specificity to the request.  But,

3  I'm not going to order the production of this significant

4  information so that plaintiffs can fish through it to identify

5  instances that they believe might support their claim.  Next,

6  N.  So, M is denied without prejudice.  Plaintiff can make an

7  application after the depositions of Albert and Lynn.  What is

8  the issue in N, Ms. Shelton?

9          MS. SHELTON:  N, regards request for production

10 Number 17 which sought all documents including e-mails which

11 concern, reflect or summarize communications by and between

12 Shelly Yak and any employees of Human Resources, including but

13 not limited to, Thomas Christian, Alan Cannazarro, Cindy Kaiser

14 Ellis or Ron Smith concerning Stephen Omogbehin for a

15 particular period.

16         THE COURT:  Well, we can't contest the relevancy of

17 that, can we?

18         MS. SHELTON:  No, Your Honor, this is -- and it's our

19 position that these had been produced in response to other

20 requests.

21         THE COURT:  Okay.  Mr. Friedman, is there an

22 objection here?  There's no question that any document or

23 e-mail regarding the plaintiff has to be produced.  No question

24 about that.  What is the objection here?

25         MR. FRIEDMAN:  The objection is that they have not

**J&J COURT TRANSCRIBERS, INC.**

62

1  responded to this specific request.  It is a very narrowly

2  drawn request and it asked for specific documentary information

3  relating to Mr. Omogbehin's claims and defenses.

4        THE COURT:  They've represented that they've produced

5  whatever they have on the plaintiff.  What else could they do?

6        MR. FRIEDMAN:  Your Honor, I don't believe that they

7  could just dump everything and say, we have produced everything

8  therefore you cannot ask specific questions and you cannot ask

9  for specific documents.

10        THE COURT:  Okay.  So, you would like plaintiff to

11  specifically identify which documents were produced in response

12  to request Number 17?

13        MR. FRIEDMAN:  Yes.

14        MS. SHELTON:  Your Honor, defendant produced a CD of

15  all of Shelly Yak's e-mail in response to this which would

16  include e-mails from her or between her and these people from

17  HR regarding Stephen Omogbehin.

18        THE COURT:  So, can you just supplement your answer

19  to N, and just identify the information that Mr. Friedman's

20  looking for, what documents you produced that are responsive to

21  N, and that should suffice.  What's the issue in O on Page 7?

22        MS. SHELTON:  This involves a request for production

23  Number 18.

24        THE COURT:  Is this a backup tape issue?

25        MS. SHELTON:  Your Honor, request for production 18,

again, like the prior request they're seeking all documents including e-mails about communications between Shelly Yak and employees of certain entities.  And because we had produced all of the e-mails of Shelly Yak we believe that production to have been complete.

    THE COURT:  What is the problem with O, Mr. Friedman?

    MR. FRIEDMAN:  It assumes a fact not in evidence.  When Ms. Shelton said we have produced all of the e-mails, what e-mails have been produced, through what method?

    THE COURT:  I don't understand.  I don't understand what the objection is to O.

    MR. FRIEDMAN:  We contend that all of the e-mails have not been produced and that the agency has not specified what e-mails have been produced and how the agency was able to confirm that that constituted all of the e-mails of Shelly Yak.

    MS. SHELTON:  Your Honor, those were the subjects of the depositions we just took.

    THE COURT:  I would assume so; the completeness of the production.

    MR. FRIEDMAN:  The completeness of the productions of e-mails of Shelly Yak?

    THE COURT:  Didn't you cover that at the depositions that were taken?

    MR. FRIEDMAN:  There was a deposition of the individual who had done some transfer of information from a

1    backup tape onto CDs.  And I wanted to establish what he did

2    and how he did it.  The CDs that we got had gaping holes in

3    terms of chronological information.

4         THE COURT:  Tell me specifically what your objection

5    is to the answer to O.

6         MR. FRIEDMAN:  The agency has not been responsive.

7    Ms. Shelton said that we had produced it, and if she can

8    identify --

9         THE COURT:  So, is your -- hold on.  Is your

10   objection you think they haven't produced all the responsive

11   documents?

12        MR. FRIEDMAN:  My objection is, they haven't stated

13   what they have produced.

14        THE COURT:  Okay.  Just like N, the defendant is

15   directed to supplement its answer to Number 18 to identify the

16   responsive documents they produced.  P; Page 8.  What's the

17   issue, Ms. Shelton?

18        MS. SHELTON:  Your Honor, P regards request for

19   production Number 19 in which plaintiff sought that defendant

20   produce in electronic format the e-mail file known as the

21   names.nsf.  This is the Lotus Notes file for Thomas Christian,

22   Alan Cannazarro, Ron Smith, and Cindy Kaiser Ellis.

23        THE COURT:  Is this relevant to the backup tape

24   issue, Mr. Friedman?

25        MR. FRIEDMAN:  The backup tape -- every request for

**J&J COURT TRANSCRIBERS, INC.**

1    information seeking the electronic document is relevant to the

2    backup tape issue.  But, the backup tape issue in and of itself

3    doesn't encompass all of the information that we're seeking.

4    And I don't want to make it sound as though we're asking for

5    information that's incredibly burdensome.  A backup tape is one

6    physical document.  There are other areas within --

7              THE COURT:  Tell me -- I want to focus on P.  What is

8    the objection to P, request Number 19?  That's what we're

9    talking about.

10             MR. FRIEDMAN:  This information is contained in --

11             THE COURT:  What are you asking for?  I don't have

12   the request in front of me.  What are you asking for?

13             MR. FRIEDMAN:  Oh.  Okay.  Produce in electronic

14   format the e-mail file known as names.nsf file in Lotus Notes

15   for Thomas Christian, Alan Cannazarro, Ron Smith, and Cindy

16   Kaiser Ellis --

17             THE COURT:  These are employees of the FAA?

18             MR. FRIEDMAN:  Yes.

19             THE COURT:  And you're not limiting it to just

20   information regarding your client, you want everything from

21   their files?

22             MR. FRIEDMAN:  These are Human Resources people.

23             THE COURT:  Okay.  You want information that's not

24   related to your client, right?

25             MR. FRIEDMAN:  We are not interested in information

1  that is not related to my client.

2          THE COURT:  From these files, Ms. Shelton, has the

3  defendant produced the information that pertains to the

4  plaintiff?

5          MS. SHELTON:  Yes, Your Honor, we both --

6          THE COURT:  Okay.

7          MS. SHELTON:  -- produced the e-mails --

8          THE COURT:  End of story.  Objection is overruled.

9  Let's go on to Q.  What is the issue in Q?

10          MR. FRIEDMAN:  Your Honor, may I be heard after her

11  response?

12          THE COURT:  Mr. Friedman, I've said time and time

13  again, I make a ruling, I'm not going backwards.  We're going

14  forward.  What's the issue in Q, Ms. Shelton?

15          MS. SHELTON:  This is a request -- regards a request

16  for production Number 20.  Request for production Number 20

17  requests that defendant produce copies of the specific backup

18  tape used to obtain all electronic information supplied to

19  plaintiff in response to plaintiff's interrogatories to

20  defendant.

21          THE COURT:  Objection overruled.  Irrelevant,

22  burdensome, cumulative.  What's the issue in S?  Did we miss R?

23  Looks like we missed R.  S, on Page 9.

24          MS. SHELTON:  As regards request for production

25  Number 21 I believe request for 21 had to do with the location

**J&J COURT TRANSCRIBERS, INC.**

1  records of certain security guards which has subsequently been

2  produced.  I believe that's moot, but if plaintiff's not

3  satisfied --

4          THE COURT:  Is that moot now, Mr. Friedman, request

5  21?

6          MR. FRIEDMAN:  If the agency has answered it.  The

7  agency's answer was none.  Now I got some information as to the

8  identity of a security person who was there on the day of Mr.

9  Omogbehin's termination, but I don't know if there are any

10  documents that are responsive to this request.  The agency's

11  answer as it stands on the agency's response was none.

12          MS. SHELTON:  Subsequent to that, and in preparation

13  of this letter I believe that we both discussed, and I believe

14  that I produced the location record, which is what you were

15  looking for, for the security guard -- for all the security

16  guards that day which would reflect which one had escorted Mr.

17  Omogbehin from the property.  I'm not sure what more he's

18  seeking.  I'm happy to oblige, but I do believe that this --

19  that there's no relevance to this line.

20          THE COURT:  What do you want, Mr. Friedman that you

21  didn't get?

22          MR. FRIEDMAN:  Any documents prepared by security

23  personnel, including security logs which describe, depict,

24  reflect, summarize or relate to the events surrounding

25  plaintiff's termination on April 23rd.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Well, that's easy.  If there's any

2     security records regarding the plaintiff, they're relevant and

3     they have to be produced.  That's not difficult.  It couldn't

4     be clearer that any document concerning the plaintiff has to be

5     produced.  Okay.  T; what's the issue with T, Ms. Shelton?

6          MS. SHELTON:  Plaintiff wanted to know Cleave

7     Laswell's employer at the time that plaintiff was terminated,

8     and his current employer.

9          THE COURT:  You didn't cover that at his deposition?

10          MR. FRIEDMAN:  Yes.  That was covered.

11          THE COURT:  So, that's moot?

12          MR. FRIEDMAN:  And also the employer Craig Rummer,

13     and a copy of the location records.

14          MS. SHELTON:  Craig Rummer is the security guard,

15     Dennis?

16          MR. FRIEDMAN:  Yes.  Yes, he is.

17          MS. SHELTON:  Craig Rummer is the security guard.

18     Your Honor, this was the first request that we had that they

19     wanted the employer of Craig Rummer.  It wasn't identified

20     specifically in the initial interrogatory.  And he wanted a

21     copy of the location records; that is, the security guard

22     location records which we have produced.

23          THE COURT:  Who's Mr. Rummer?

24          MS. SHELTON:  Craig Rummer, I believe, is the

25     security guard.  Is that correct?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FRIEDMAN:  I think he was.

2          THE COURT:  So, is there a dispute now?  Have you

3   worked this out?

4          MS. SHELTON:  I don't know.  Is there something more

5   that you're --

6          MR. FRIEDMAN:  Do we have his employer?

7          THE COURT:  His current employer, Mr. Rummer?

8          MR. FRIEDMAN:  At the time he was employed.

9          THE COURT:  Oh, you mean he was -- was he working for

10   a private company?

11          MR. FRIEDMAN:  Yes.

12          THE COURT:  That has to be identified.  If it hasn't

13   been, his employer has to be identified.  Okay.  That takes us

14   through the letter, correct?

15          MR. FRIEDMAN:  Yes.

16          THE COURT:  All right.  Mr. Friedman, file your

17   motion to compel regarding the backup tape issue by March 17th.

18          MR. FRIEDMAN:  Your Honor, we have -- in regard to

19   the spoliation issue Ms. Shelton and I -- or I have identified

20   approximately seven or eight other people that I wanted to

21   depose just to provide the Court with additional information to

22   support the spoliation motion.  I had anticipated that all

23   seven or eight would take one day.  It could possibly spill

24   into a second day.  And I probably, based on a very brief

25   vacation that I'm taking at the end of next week, I probably

1  would not be able to schedule something until the latter part

2  of the first week in March or the second week in March.

3            THE COURT:  Ms. Shelton, are you objecting to those

4  depositions?

5            MS. SHELTON:  Your Honor, I'm not clear.  The seven

6  or eight people that he intends to depose, he wants for the

7  purposes of a spoliation motion.  And I believe what the Court

8  had ordered was that plaintiff could file a motion to compel

9  the production of the backup tapes.

10            THE COURT:  Correct.

11            MS. SHELTON:  And they're two different issues.

12            THE COURT:  Are you going to object to Mr. Friedman's

13  request to take seven or eight depositions on spoliation

14  issues?  Have you identified for Ms. Shelton who you want to

15  depose and the purpose of the depositions?

16            MR. FRIEDMAN:  Yes.  The specific purpose which she

17  had asked for and I relayed to her was the knowledge of these

18  individuals of Mr. Omogbehin's initial request for information,

19  their involvement in preserving the information, and their

20  involvement in obtaining the information requested.  So, it

21  goes --

22            THE COURT:  Haven't you -- has that issue already

23  been addressed at the depositions?

24            MR. FRIEDMAN:  There was a deposition of three

25  individuals.  We are dealing with a request that Mr. Omogbehin

1    made after he was terminated which request went to a number of

2    different people.

3           THE COURT:  Ms. Shelton, are you objecting to these

4    depositions?

5           MS. SHELTON:  I would object to that these

6    depositions occur before March 17.  I don't think that they're

7    necessary to file the motion to compel.  I think if the Court

8    -- it would be appropriate for there to be a ruling on whether

9    or not we've met our production burden before or have had an

10   opportunity for the Court to rule as to whether or not we've

11   produced this stuff or how it's been produced before a motion

12   to -- for spoliation is filed.  So, at this time I would object

13   to the need for these depositions to happen prior to the motion

14   to compel because plaintiff already has very firm beliefs about

15   what he thinks hasn't been produced and what he thinks should

16   be produced, and that is the backup tape.

17          THE COURT:  The Court agrees.  The Court agrees that

18   until we get through the production it's premature for the

19   plaintiff to file a spoliation motion.  So, that the request to

20   take these seven or eight depositions is denied without

21   prejudice at this time.  Plaintiff will file its motion.  You

22   say you can't get it filed by March 17th?

23          MR. FRIEDMAN:  Your Honor, may I please be heard just

24   to respond to what Ms. Shelton had said?  Thank you.  It's not

25   only to file a spoliation motion, but in the course of

J&J COURT TRANSCRIBERS, INC.

1  discovery the first broad base approach that I use, which may

2  be improper, it may not be what other attorneys do, but I want

3  to know what information is available, through what sources,

4  and who is in control, and in possession of those sources of

5  information.  That is the purpose of questioning these people,

6  especially as it concerns their knowledge of the information

7  that had been requested at the time Mr. Omogbehin was

8  terminated, and their specific efforts to either acquire that

9  information or to keep it in their possession and control.

10         MS. SHELTON:  Your Honor --

11         THE COURT:  I've heard enough argument on this issue.

12  The Court determines that at this time it will bar plaintiffs

13  from taking the seven or eight depositions on the issues that

14  Mr. Friedman has identified.  The Court believes it's

15  appropriate to complete defendant's production before we get to

16  these issues.  The request for the depositions is denied

17  without prejudice.  We can talk about taking the depositions at

18  another time.

19         We're going to get this motion filed, we're going to

20  have oral argument on the motion.  At that conference we're

21  going to set a discovery schedule on the case.  It's time that

22  we turn from focusing on the minutia of these technical

23  computer issues that we get to the merits of the issues.

24         I can tell you, Mr. Friedman, with confidence,

25  because I tell litigants in every case, if it turns out that

73

1   your client does not have information at a deposition that is

2   subsequently produced, your client will not be prejudiced.  You

3   will be given the right to question the witness about

4   subsequently produced information.  But, it's time to get to

5   the merits of this case.  If you tell me you can't file your

6   motion to compel on the backup issue by March 17, March 24 that

7   motion has to be filed.

8        I'll schedule oral argument on the motion.  I'll put

9   in my order that I want to hear from plaintiff before that

10  conference the identity of every witness that the plaintiff

11  wants to depose.  At that conference we'll get a final schedule

12  for fact depositions in the case from both sides.  The Court's

13  limit of ten depositions stays absent good cause.  The Court

14  has not seen good cause yet to exceed the ten deposition limit

15  in the case.  Anything else, Mr. Friedman?

16       MR. FRIEDMAN:  Yes.  One very brief comment, that was

17  the representation of the U.S. Attorney at the first conference

18  in June of 2007 was that they would produce the backup tape.

19  Number 2, in terms of another issue, the audio tape issue.  Mr.

20  Omogbehin had asked for a voice mail tape.  The agency

21  indicated that it would go through a tremendous expense in

22  order to extract the audio information from a voice mail tape

23  because the system that had been in place at the time the

24  voice mail tape was created was no longer the operating

25  software system that the agency used.  So we had asked for a

1  copy of the tape so that we could extract that.  The agency

2  represented that the cost of extraction would be thousands of

3  dollars --

4          THE COURT:  What do you want, Mr. Friedman?

5          MR. FRIEDMAN:  We want the audiotape.

6          THE COURT:  Ms. Shelton, can the audiotape be

7  produced, or has it been produced?

8          MR. FRIEDMAN:  No, it has not been --

9          THE COURT:  Let me ask the Government.

10          MS. SHELTON:  Your Honor, no.  And I believe that

11 this issue -- this was a conference that was held prior to my

12 taking over the case.  And my understanding of the minutes from

13 that conference were that the defendant's prior counsel had

14 represented that because the system was no longer available

15 we'd have to hire a contractor and they agreed to do it and

16 incur the expense to do that.  And so that was done and those

17 voice mails that were recovered were produced on disk in wave

18 format to plaintiff.

19          THE COURT:  So, what do you want, Mr Friedman, if you

20 have that?

21          MR. FRIEDMAN:  The same issue and it deals, Your

22 Honor, with representations that have been made by opposing

23 side.  Now, let me give you an example, please.  In June of

24 2007 Mr. Aftab, the Assistant U.S. Attorney represented to you

25 that it was difficult to extract from the backup files the

1   electronic versions of e-mails for various people.  And he

2   represented to the courts that it would take 80 hours to do

3   that function because what was necessary was that there needed

4   to be efforts to go into the various files in the backup tapes

5   and to perform whatever needed to be performed.  The witness

6   who was deposed stated that it took an hour and a half to two

7   hours to get all of the electronic information.  That was a --

8   obviously a representation that did not appear to be accurate.

9            MS. SHELTON:  Your Honor, at best --

10           THE COURT:  Mr. Friedman, all I want to know is, what

11   do you want?

12           MR. FRIEDMAN:  We want the actual tape.  Mr.

13   Omogbehin contends that there were voice mail messages that he

14   --

15           THE COURT:  Okay.  So, this relates to sort of the

16   backup tape issue, but now we're talking about voice mails

17   instead of e-mails.

18           MR. FRIEDMAN:  Yes.

19           THE COURT:  Include it in your motion.  Anything

20   else?  Anything else for the Government?

21           MS. SHELTON:  Your Honor, I'm just curious.  When

22   will the motion to compel -- when will the hearing on the

23   motion to compel the oral argument be held, only because I have

24   a trial?

25           THE COURT:  I don't have a specific date now, but I

1  will -- how much time will you reasonably need to respond to

2  the motion?

3           MS. SHELTON:  It's going to depend on when the

4  hearing is, Your Honor.  I have a trial that begins April 1st

5  that will be a week long.  That's going to take up,

6  unfortunately, most of March to prepare for.

7           THE COURT:  I'm going to give you 30 days to respond

8  to the motion.  Respond by April 4 -- April 24.  I didn't mean

9  to get you nervous.  And we'll get together in early April.

10  Okay.  Any other issues?

11           MR. FRIEDMAN:  Not at this time.

12           THE COURT:  Thank you, counsel.  We're adjourned.

13                        * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

We, PAT REPKO and KIMBERLY UPSHUR, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Pat Repko                           DATE:  May 1, 2009

PAT REPKO


/s/ Kimberly Upshur

KIMBERLY UPSHUR

J&J COURT TRANSCRIBERS, INC.


(JL&CR)


**J&J COURT TRANSCRIBERS, INC.**